United States District Court
Southern District of Texas

**ENTERED**
July 02, 2026
Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| MARVIN YOUNG,<br>(TDCJ # 01323226), | § § § § § | |
| *Plaintiff,* | § § | |
| vs. | § § | CIVIL ACTION NO. H-24-1152 |
| BRYAN COLLIER, *et al.,* | § § § | |
| *Defendants.* | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The plaintiff, Marvin Young, (TDCJ #1323226), is currently in the custody of the Texas Department of Criminal Justice—Correctional Institutions Division ("TDCJ"). Proceeding *pro se* and *in forma pauperis*, he filed an amended civil rights complaint under 42 U.S.C. § 1983. (Dkt. 12). Broadly speaking, Young's amended complaint alleges that four TDCJ officials and a UTMB mental health counselor at the Wayne Scott Unit conspired to fail to protect him from violence from another inmate, that he was injured by that inmate as a result of the conspiracy, and that two of the TDCJ officials and four UTMB medical officials ignored his injuries and denied him medical care. (*Id.*). The Court previously dismissed some of the defendants and claims. (Dkt. 37). The three remaining defendants answered the complaint and then filed a motion for summary judgment as to the remaining claims.

(Dkts. 40, 56, 75).  Young filed a timely response.  (Dkts. 66, 67).  After a thorough review of the motion and response, the summary judgment evidence, the record, and the law, the Court grants the motion for summary judgment and dismisses this action with prejudice.  The reasons are explained below.

## I.    BACKGROUND

Young is currently an inmate at TDCJ's Holliday Unit, (Dkt. 70), but he was previously incarcerated at the Wayne Scott Unit.  (Dkt. 12).  The Wayne Scott Unit is a 600-bed facility for inmates with chronic psychiatric conditions.  (*Id.* at 20).  Young alleges that because inmates are assigned to this Unit based on their complex mental health diagnoses, prison officials often deal with inmates who are "unpredictable" and violent against others.  (*Id.*).  He alleges that based on the nature of his chronic psychiatric conditions, he had been designated as "no cell pairing," meaning he would be assigned to a single cell with no cellmates as part of his mental health treatment program.[1]  (*Id.*).

Young alleges that on June 8, 2022, two other inmates in his pod—Odell Hall and Patrick McDonald—got into a fight.  (*Id.* at 8-9).  Needing to find a place to relocate one of those two inmates, Sergeant LaToy Lavan approached Young and

---

[1]The parties dispute whether Young was actually designated to be housed only in a single cell.  Because resolution of that dispute is unnecessary to the Court's decision on the issues raised in the motion for summary judgment, the Court will not further address that dispute.

asked, "Why you get a cell all by yourself?" (*Id.* at 9). Young responded that he was assigned a single cell as part of his mental health treatment. (*Id.*). Lavan responded that she needed to find a cell for another inmate, so "you getting a cellie today." (*Id.*). Young responded that he was in a single cell in part because he had been attacked by certain groups of inmates. (*Id.*). Lavan replied that Young could either go to a seclusion cell or write a grievance because he was going to "get a cellie today." (*Id.*). Young alleges that Lavan contacted Captain Newell, who approved housing McDonald with Young after consulting with Classification Officer Torres. (*Id.*). Once that was done, Lavan transferred McDonald and his belongings to Young's cell. (*Id.*).

Three days later, on June 11, 2022, McDonald started making lewd sexual gestures at Young. (*Id.* at 9-10). Young went to the cell door and started knocking to try to get the attention of a corrections officer. (*Id.*). As Young stood at the door, McDonald attacked him from behind, digging his fingers into Young's left eye. (*Id.*). Young struggled for a bit and then was able to get away, at which point he punched McDonald in self-defense. (*Id.* at 11). A detention officer arrived soon after, removed McDonald from the cell, and told Young that he would send a nurse to check his eye. (*Id.*). Young alleges that his eye was clearly injured in the attack. (*Id.*). It was swollen and bruised, and the eyeball had blood in it. (*Id.*). He had no peripheral vision, his eye had a gritty feel to it, and it was tearing. (*Id.* at 11-12).

3/31

In response to the detention officer's call for assistance, Lavan and Captain Newell arrived at Young's cell. (*Id.* at 12). Lavan looked at Young's eye and said, "Look at that eye; he got your a*s good, didn't he?" (*Id.*). At that same time, Captain Autumn Watson arrived at the scene. (*Id.*). Watson pulled Lavan away from Young, and the two had a discussion that Young could not hear. (*Id.* at 12-13).

As Lavan and Watson talked, Nurse Thomas arrived to look at Young's eye and provide a post-incident medical check. (*Id.* at 13). Nurse Thomas glanced into the cell, but Watson pulled her away before she could check on Young's eye. (*Id.*). Young could not hear their entire conversation, but he did hear Nurse Thomas say, "What about his eye, Sergeant Lavan?" (*Id.*). Watson, Lavan, and Nurse Thomas then left the area, with no one having examined Young's eye. (*Id.*). Young alleges that his eye was not examined that day nor did any official ever conduct the post-incident medical evaluation required by TDCJ rules. (*Id.*).

Young alleges that he placed a sick-call request to obtain medical care for his eye on June 12. (*Id.* at 17). No record of this sick-call request appears in the summary judgment evidence.

Young alleges that he saw mental health provider Nurse Ihaza on June 14, 2022. (*Id.* at 13). Young alleges that Ihaza expressed alarm at Young's eye injury and told Young that he needed to be seen by Unit Medical Provider Dr. Rothrock as soon as possible. (*Id.*). Young told Ihaza that he had seen Nurse Mariamma

4/31

Varughese over the weekend, but she refused to examine his eye or provide any treatment. (*Id.*)  Instead, she told him that he had to "place a sick call" to be seen. (*Id.*).  Young told Ihaza that he had submitted a sick-call request, but no one had contacted him yet about an appointment. (*Id.*).

Later on June 14, Young saw Varughese on the pod during insulin distribution. (*Id.* at 16-17).  She ignored Young's eye condition and refused to answer any of his questions about the sick-call request. (*Id.* at 17).  The next day, Young saw Varughese again during insulin distribution on the pod. (*Id.*).  When Young asked about his sick-call requests, Varughese told him to "stop asking" and that she would "tell the provider about your damned eye." (*Id.*).  Nevertheless, no one contacted Young about an appointment or arranged for him to see a provider. (*Id.*).

On June 22, Young saw Ihaza again, and Ihaza expressed concern that Young had not yet received medical care for his eye. (*Id.*).  He told Young that he would speak with Varughese about scheduling an appointment with a provider. (*Id.*).  Despite this, no one contacted Young about an appointment or arranged for him to see a provider. (*Id.*).

On June 23, Young saw Mental Health Supervising Therapist Monica Greer, and she asked him about his eye. (*Id.*).  When Young told her that he had repeatedly asked Varughese about an appointment but that nothing had been done, Greer said

she would speak with Varughese. (*Id.*). On June 27, Young submitted another sick-call request, which Varughese either ignored or "trashed." (*Id.* at 17-18).

On July 1, Young submitted yet another sick-call request. (*Id.* at 17-18). That request was returned to him on July 3 with a notation stating that Nurse Paningbatan had seen him. (*Id.* at 18). Young states that this is false, that he was never seen by Paningbatan or any other nurse, and that he still had not been examined by any medical provider or provided with any treatment for his eye injury. (*Id.*).

Records attached to Young's original complaint, and incorporated by reference into his amended complaint, show that he filed a Step 1 grievance on July 7, 2022, about being housed with another inmate in violation of his mental health restrictions. (Dkt. 1, pp. 72-73). In that grievance, Young stated that he had been denied medical attention for his eye since the assault on June 11. (*Id.* at 72). The response stated that there was no evidence to support Young's claim that Lavan "incited" McDonald to attack Young, but it did not address his claim concerning the lack of medical care. (*Id.* at 73). In his Step 2 grievance appeal, Young repeated his allegations that Lavan knew that housing McDonald with Young would put Young in danger, but she did it anyway. (*Id.* at 74-75). The response stated that an inmate protection investigation was completed and there was no evidence to support Young's allegations. (*Id.* at 75). There was again no mention about the failure to provide Young with medical care.

6/31

Also attached to Young's initial complaint and incorporated into his amended complaint is a grievance from October 21, 2022, in which Young asserted that he had been denied medical care for his eye from June 14 through June 22. (*Id.* at 80-81). The response indicated that TDCJ records did not show that Young submitted any sick-call requests for medical care between June 3 and July 2, 2022. (*Id.* at 81). The response stated that he was seen by nursing staff on July 3 and referred to a provider, but he was not seen by the provider for reasons unknown. (*Id.*). The response also indicated that Young had been scheduled for an appointment with a specialist at Hospital Galveston, but he refused the appointment. (*Id.*). Young alleges that the refusal form is a forgery. (Dkt. 12, p. 20).

Young alleges that the injury to his eye progressed without treatment to the point that he became blind in that eye. (*Id.* at 19). He alleges that he also suffered a deteriorating mental state because of the uncertainty of his future vision. (*Id.* at 20, 22). Ultimately, in May 2023 he underwent surgery to repair the eye and restore his vision. (*Id.* at 22).

Young alleges that Lavan knew that McDonald was violent based on his history and his altercation with Hall earlier that same day. (*Id.* at 14). He alleges that she also knew that he had been assigned to a single cell by Unit mental health professionals. (*Id.* at 15). Despite this, she failed to honor Young's classification

7/31

and deliberately failed to protect him from harm by housing a known violent inmate in his cell. (*Id.* at 14-15).

Young alleges that Watson conspired with Lavan to cover up the wrongs that had resulted in Young's injuries. (*Id.* at 15). He alleges that Watson and Lavan also denied Young medical care by refusing to permit Nurse Thomas to treat him on the day of the assault. (*Id.*).

Young alleges that Varughese was deliberately indifferent to his injuries by actively denying him medical care for his eye between June 11 and July 3. (*Id.* at 19). He alleges that Varughese also falsified medical records by "trashing" his sick-call requests and by falsely stating that he had been seen by Nurse Paningbatan when he had not. (*Id.* at 19).

Young claims that all these actions violated his constitutional rights under the Eighth Amendment. (*Id.* at 23). He seeks both compensatory and punitive damages, as well as injunctive relief, against the defendants. (*Id.* at 4, 24-25).

After the Court's order on the motion to dismiss, Lavan, Watson, and Varughese answered the amended complaint. (Dkt. 40). They later filed a motion for summary judgment, along with classification records, grievance records, portions of Young's medical and mental health records, and several affidavits. (Dkts. 56, 75).

8/31

The medical records offered in support of the motion for summary judgment show that on June 14, 2022—three days after the fight with McDonald—Young filed a sick-call request directed to his mental health therapist, Ms. Martinez. (Dkt. 75, p. 39). He reported that he had been attacked in his cell by McDonald, who "nearly digging [sic] out my left eye." (*Id.*). He reported that his eye was bruised, bloodshot, red, and painful. (*Id.*). But his primary complaint was that his anxiety level had been elevated since the attack. (*Id.*). The same day, Young was seen by Nurse Ihaza, who reported that Young had "left orbital redness" as a result of the fight. (*Id.* at 32). No complaints of pain are documented. (*Id.*). Ihaza referred Young to medical "per protocol." (*Id.* at 36).

On June 20, Young submitted another sick-call request, again directed to the mental health provider. (*Id.* at 41). He again reported that his anxiety levels were very high since the attack. (*Id.*). He was scheduled to be seen by mental health on June 23. (*Id.*).

On June 22, Ihaza reported that Young had "flagged [him] down" to say that he had not yet been seen by medical. (*Id.* at 45). Ihaza noted "orbital redness" and reported that Young was complaining of eye pain. (*Id.*). Ihaza again referred Young for a medical appointment. (*Id.*).

On June 23, Young had a "triage interview" with mental health provider Greer. (*Id.* at 47–50). Young reported that he "saw the doctor yesterday" for his

9/31

eye injury, and "he referred me to medical." (*Id.* at 48–49). Greer noted that Young's left eye was red. (*Id.* at 49). No complaints of pain were documented. (*Id.*). Greer made another referral to a medical provider for Young's eye. (*Id.* at 50).

On July 1, Young submitted a sick-call request to medical provider Dr. Rothrock. (*Id.* at 52). He reported that his eye was painful, hemorrhaged, and tearing and that he had blurred vision. (*Id.*). A note on the request states that Young was seen for the problem on July 3, at which time the issue was addressed. (*Id.*).

The July 3 medical record shows that Young was seen for his eye injury by Nurse Varughese. (*Id.* at 54–56). At that time, Young reported that his left eye was painful and red. (*Id.* at 55). Varughese noted no signs of any vision problems and reported that Young "wants to see the medical provider." (*Id.*). She referred him to the medical provider for an appointment. (*Id.*). Medical provider Dr. Rothrock electronically signed the note on July 13, but there is no indication that she saw Young at that time. (*Id.* at 56). Instead, it appears that Young first saw Dr. Rothrock for the injury on October 14, 2022, at which time he also discussed three other ongoing issues. (*Id.* at 58–61). At the end of the appointment, Dr. Rothrock referred Young to ophthalmology for a consultation about the eye injury. (*Id.* at 60).

Medical records show that Young was scheduled for an ophthalmology appointment at Hospital Galveston on November 10, 2023. (*Id.* at 63). He refused transport. (*Id.* at 65–67).

On February 24, 2023, Young submitted a sick-call request to Dr. Rothrock, asking when he would be scheduled for an eye evaluation. (*Id.* at 69). He was reminded of the earlier refusal and told the appointment would be rescheduled. (*Id.*)

On March 27, 2023, Young submitted another sick-call request to Dr. Rothrock, asking when his eye appointment would be scheduled. (*Id.* at 71). He was seen by Dr. Rothrock on March 31 and again referred to ophthalmology. (*Id.* at 79, 85). On May 1, 2023, he was seen by Dr. Kevin Merkley at UTMB ophthalmology for a consultation, at which he was diagnosed with a traumatic cataract in his left eye and scheduled for cataract surgery. (*Id.* at 97–99). The surgery occurred May 5, 2023. (Dkt. 56-5, p. 11).

In addition to the medical records, the defendants offer the affidavit of Dr. Merkley, who states that traumatic cataracts are common after blunt or penetrating trauma to the eye. (*Id.* at 10). Such a cataract may develop shortly after the trauma or during several months after it. (*Id.*). Surgery is not recommended immediately after trauma; instead, time must be allowed for swelling to dissipate, any corneal swelling to resolve, and intraocular pressure to normalize. (*Id.*). Dr. Merkley's review of Young's records, as well as his own recollection, was that Young had no

additional injuries to his eye from the altercation. (*Id.* at 10–11). There was no evidence of retinal detachment, iris injury, lens capsule injury, corneal laceration, or open globe. (*Id.* at 11). Based on his review of the records and knowledge of the patient, his expert opinion is that no significant harm resulted from any delay in treatment of Young's eye. (*Id.*).

The defendants contend that all of this evidence shows that no genuine disputes of material fact exist concerning any of Young's claims against them and that they are entitled to summary judgment as a matter of law. (Dkt. 56). They also contend that they are entitled to qualified immunity. (*Id.*).

Young filed a timely response, supported by his own affidavit. (Dkts. 66, 67). He generally reiterates his version of events and reasserts the claims raised in his amended petition.

## II.    **LEGAL STANDARDS**

### A.    **Actions Under 42 U.S.C. § 1983**

Young brings his action under 42 U.S.C. § 1983. "Section 1983 does not create any substantive rights, but instead was designed to provide a remedy for violations of statutory and constitutional rights." *Lafleur v. Texas Dep't of Health*, 126 F.3d 758, 759 (5th Cir. 1997) (per curiam); *see also Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). To state a valid claim under § 1983, the plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United

12/31

States, and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *See West v. Atkins,* 487 U.S. 42, 48 (1988); *Gomez v. Galman,* 18 F.4th 769, 775 (5th Cir. 2021) (per curiam). The first element recognizes that "state tort claims are not actionable under federal law; a plaintiff under [§] 1983 must show deprivation of a federal right." *Nesmith v. Taylor,* 715 F.2d 194, 195 (5th Cir. 1983) (per curiam). The second element means that generally only *state* actors—not private parties—can be liable for violations of civil rights. *Frazier v. Bd. of Tr. of Nw. Miss. Reg'l Med. Ctr,* 765 F.2d 1278, 1283 (5th Cir. 1985).

## B.    The Summary-Judgment Standard

The defendants have moved for summary judgment. "Summary judgment is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton,* 572 U.S. 650, 656–57 (2014) (per curiam) (quoting FED. R. CIV. P. 56(a)). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.,* 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–25 (1986)). "A fact is material if its resolution could affect the outcome of the action." *Dyer v. Houston,* 964 F.3d 374, 379 (5th Cir. 2020) (quoting *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.,* 627 F.3d 134, 134 (5th Cir.

13/31

2010)). "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Westfall v. Luna*, 903 F.3d 534, 546 (5th Cir. 2018) (per curiam) (cleaned up).

When considering a motion for summary judgment, the district court must view all evidence and draw all inferences "in the light most favorable to the [nonmoving] party." *Tolan*, 572 U.S. at 657 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)); *see also Dyer*, 964 F.3d at 380. When both parties submit evidence that tends to show conflicting facts, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995). But if record evidence clearly contradicts a party's version of events, the court "should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Waddleton v. Rodriguez*, 750 F. App'x 248, 253–54 (5th Cir. 2018) (per curiam) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Further, courts will not consider the nonmoving party's conclusory allegations and unsubstantiated assertions as evidence. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). After viewing the offered evidence in the light most favorable to the nonmoving party, summary judgment may be granted only if no genuine disputes of fact exist and no reasonable jury could return a verdict for the nonmoving party. *See,*

14/31

*e.g., Rubinstein v. Adm'rs of the Tulane Educ. Fund,* 218 F.3d 392, 399 (5th Cir. 2000).

### C.   *Pro Se* Pleadings

Because Young is proceeding *pro se*, the Court construes his filings liberally, subjecting them to "less stringent standards than formal pleadings drafted by lawyers[.]" *Haines v. Kerner,* 404 U.S. 519, 520 (1972) (per curiam).  But even under this lenient standard, *pro se* litigants must still "abide by the rules that govern the federal courts." *E.E.O.C. v. Simbaki, Ltd.,* 767 F.3d 475, 484 (5th Cir. 2014). "*Pro se* litigants must properly plead sufficient facts that, when liberally construed, state a plausible claim to relief, serve defendants, obey discovery orders, present summary judgment evidence, file a notice of appeal, and brief arguments on appeal." *Id.* (footnotes omitted).

### III.   DISCUSSION

### A.   The Failure-to-Protect Claim against Lavan

Young alleges that Lavan violated his constitutional rights by failing to protect him from inmate-on-inmate violence when she transferred McDonald to his cell despite knowing of McDonald's violent nature.  Lavan contends that she had no authority to make housing decisions and so was neither deliberately indifferent to Young's safety nor the cause of any alleged constitutional violation.

Under the Eighth Amendment, prison officials have a duty "to protect prisoners from violence at the hands of other prisoners." *Williams v. Hampton*, 797 F.3d 276, 280 (5th Cir. 2015) (en banc) (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). But "[p]risons are necessarily dangerous places." *Farmer*, 511 U.S. at 858 (Thomas, J., concurring in the judgment). Therefore, prison officials are not expected to prevent all inmate-on-inmate violence. *See Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003); *see also Farmer*, 511 U.S. at 834 ("[N]ot . . . every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety."). Instead, a plaintiff claiming a failure to protect must allege and prove that he is incarcerated under conditions posing a substantial risk of serious harm and that the prison official acted with "deliberate indifference to inmate health and safety." *Id.* (quoting *Farmer*, 511 U.S. at 834). The plaintiff must also allege and prove that the defendant's deliberate indifference was the actual cause of the ensuing harm. *See Hulsey v. Bishop*, No. 24-10014, 2024 WL 4692029, *6 (5th Cir. Nov. 6, 2024) (per curiam) (citing *Williams*, 797 F.3d at 296 (Elrod, J., concurring)).

Deliberate indifference in all contexts "is an extremely high standard to meet." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001). In the context of a failure-to-protect claim, the plaintiff alleging deliberate indifference must show that the prison official was subjectively aware that the prisoner faced "a

16/31

substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it." *Davis v. Lumpkin*, 35 F.4th 958, 963 (5th Cir. 2022) (quoting *Farmer*, 511 U.S. at 847). A defendant fails to take reasonable measures to abate a risk when he or she "knew of ways to reduce the harm but knowingly declined to act, or . . . recklessly declined to act." *Hale v. Tallapoosa County*, 50 F.3d 1579, 1583 (11th Cir. 1995); *see also LaMarca v. Turner*, 995 F.2d 1526, 1536 (11th Cir. 1993) ("[I]f an official attempts to remedy a constitutionally deficient prison condition, but fails in that endeavor, he [or she] cannot be deliberately indifferent unless he [or she] knows of, but disregards, an appropriate and sufficient alternative."). But if the defendant responded reasonably to a known risk, no liability will exist "even if the harm was ultimately not averted." *Farmer*, 511 U.S. at 844.

Construing the facts and evidence in the light most favorable to Young, as the Court must at this juncture, shows that genuine issues of material fact exist as to whether Lavan knew that Young faced a substantial risk of serious harm by having McDonald housed with him. In her affidavit in support of the motion, Lavan denies any recollection of the specific incident on June 8, 2022. (Dkt. 56-6, pp. 2–3). Young offers sworn testimony that Lavan assisted in breaking up a physical assault between McDonald and his cellmate earlier in the day. (Dkt. 12, p. 9). He also offers sworn testimony that Lavan knew that Young had strong attitudes against

17/31

homosexuals, which would be challenged by McDonald's presence in his cell. (*Id.* at 8–9). These facts, taken as true, are sufficient to raise genuine disputes of fact as to whether Lavan knew that Young faced a substantial risk of serious harm by being housed with an angry inmate whose lifestyle differed from Young's.

But there is no evidence showing that Lavan responded unreasonably to that risk. Instead, the undisputed evidence shows that Lavan had no authority to either make or change a cell assignment for any inmate. In an affidavit submitted by Warden Amber Ochoa, Ochoa states that the Wayne Scott Unit, as a psychiatric inpatient facility, operates differently from other TDCJ units. (Dkt. 56-1, p. 1). Because of the unique situations of each inmate, "all housing decisions at the Wayne Scott Unit are made in conjunction with on-site medical and mental health staff who are employed by UTMB." (*Id.*). TDCJ officers there have no authority to determine where to house a prisoner or to override a decision on that issue made by UTMB officials. (*Id.* at 2).

Likewise, Lavan states in her affidavit that the only officials at the Wayne Scott Unit with the authority to determine where to place inmates are those assigned to the "Count Room," which is a division of TDCJ Unit Classifications. (Dkt. 56-6, p. 2). She asserts that if she placed McDonald in a cell with Young, it would have been solely at the direction of TDCJ officials in the Count Room after their consultation with UTMB staff. (*Id.* at 2–3). She denies ever attempting to influence

18/31

Young's housing determination and states that she did not have either the rank or authority to do so even had she tried. (*Id.* at 3).

Young agrees that Lavan had no authority to make or change housing assignments. (Dkt. 66, pp. 1–2). But he nevertheless asserts that she "coerced" Count Room officials into placing McDonald in his cell because of a "personal" and "longstanding" agenda against him. (*Id.* at 14.). These allegations are conclusory and unsupported by any TDCJ records. Young's opinions concerning Lavan's motivations are not evidence, nor are they supported by any competent evidence. They are therefore legally insufficient to create an issue of material fact that would preclude entry of summary judgment.

In sum, the competent summary judgment evidence shows that Lavan had no authority to assign inmates to cells or to change their cell placements. While she may have been aware that housing McDonald with Young could pose a risk of harm, her decision to follow the instructions of the Count Room, as informed by UTMB mental health officials, concerning where to house McDonald was a reasonable response to that risk. This reasonable response negates Young's claims of deliberate indifference and requires entry of summary judgment in favor of Lavan on this claim.

The motion for summary judgment by Sergeant Lavan as to the claim against her for failure to protect is granted. This claim will be dismissed with prejudice.

19/31

**B.     The Claims for Denial of Medical Care Against Lavan and Watson**

Young next alleges that Lavan and Watson violated his constitutional rights when they were deliberately indifferent to his need for medical care after the fight with McDonald.  Lavan and Watson contend that there is no evidence that their alleged actions, even if improper, resulted in substantial harm.

The Eighth Amendment's prohibition against cruel and unusual punishment guarantees prisoners the right to have their serious medical needs addressed.  *See Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006).  A "serious medical need" is one "for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required."  *Id.* at 345 n.12.  Prison officials violate the Eighth Amendment when they are deliberately indifferent to a prisoner's serious medical needs, resulting in the unnecessary and wanton infliction of pain. *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991).

But as explained above, the standard for deliberate indifference is "extremely high." *Domino*, 239 F.3d at 756.  The plaintiff must show that the prison official was aware that he faced "a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it." *Davis*, 35 F.4th at 963 (quoting *Farmer*, 511 U.S. at 847).  In addition, when a claim is based on a *delay* in medical care, the plaintiff must show not only that a delay occurred, but also that that the delay *itself* resulted in substantial harm. *See Alderson v. Concordia Parish*

20/31

*Corr. Facility*, 848 F.3d 415, 422 (5th Cir. 2017) (per curiam); *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006) (per curiam); *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993)).   Thus, in the context of a claim against a prison official for the denial of medical care, the plaintiff must show (1) that he was exposed to a substantial risk of serious harm, (2) that the defendants subjectively knew of this substantial risk, (3) that the defendants denied or delayed medical treatment despite their knowledge of the substantial risk, and (4) that the denial of or delay in treatment resulted in substantial harm.  *See Petzold v. Rostollan*, 946 F.3d 242, 249 (5th Cir. 2019).

Young alleges that Lavan and Watson saw the injury to his eye, which was of such a nature that laymen would recognize that at least some care was needed.  (Dkt 12, pp. 11–12).   But he alleges that when Nurse Thomas arrived at his cell, Lavan and Watson pulled her away and would not allow her to assess him.  (*Id.* at 13). Lavan states in her affidavit that she does not recall this specific incident but that she would have followed the protocol of calling a nurse to triage Young at his cell after the incident.  (Dkt. 56-6, pp. 2–3).   However, the defendants have not provided a medical record of any kind showing that Young was provided with triage care for his eye on June 11, whether by Nurse Thomas or anyone else.  Thus, disputed issues of fact exist as to the first three elements of deliberate indifference.

21/31

But Young fails to offer any evidence to show that this deliberate indifference resulted in substantial harm, and the summary judgment evidence is to the contrary. In his amended complaint, Young alleges that his vision deteriorated without treatment to the point that he became blind in his left eye. (Dkt. 12, pp. 20–21). This allegation, standing alone, is not sufficient to avoid summary judgment for two reasons.

First, the only delay for which Lavan and Watson can be held responsible was from June 11, when the incident occurred, until June 14, when Young saw Nurse Ihaza and was referred to medical for triage. Young offers no competent evidence to show that his traumatic cataract and resulting blindness were caused by this three-day delay. And any delay in treatment after June 14 resulted from the actions of prison officials other than Lavan and Watson.

Second, Dr. Merkley opined in his affidavit that Young's temporary blindness from the traumatic cataract was neither caused by nor affected by the three-day delay from June 11 until June 14. (Dkt. 56-5). He states that traumatic cataracts can form after eye trauma, but treatment and surgery are not recommended immediately after the injury. (*Id.* at 10). Instead, treatment is delayed to allow for bleeding and swelling to dissipate, corneal swelling to resolve, and intraocular pressure to normalize. (*Id.*). Dr. Merkley's professional medical opinion is that no delay in treatment—much less the three-day delay occasioned by Lavan and Watson's

22/31

actions—caused any substantial injury to Young's eye, much less the blindness that resulted from the traumatic cataract. (*Id.* at 11). This evidence contradicts Young's claim that Lavan and Watson's deliberate indifference resulted in substantial harm.

Young also alleges that he suffered pain from his eye injury in the days immediately after the fight. While pain suffered during a delay in medical care can constitute substantial harm, *see Alderson*, 848 F.3d at 422, the plaintiff must show that the pain was sufficiently severe to constitute substantial harm. *Compare Westfall*, 903 F.3d at 551 (finding no substantial harm when the plaintiff's spinal injury was not "impacted" by a 30 to 45-minute delay in care and the plaintiff alleged only that, during the delay, she was "moaning in pain."); *Richard v. Martin*, 390 F. App'x 323, 325 (5th Cir. 2010) (per curiam) (plaintiff's "neck pain, which resolved within a few weeks, and chronic mild back pain" were not sufficient to establish substantial harm resulting "from the alleged 10-day delay in seeing a nurse and/or the 20-day delay in being taken to a doctor"); *and Bisby v. Garza*, 342 F. App'x 969, 971 (5th Cir. 2009) (per curiam) (finding that pain following a fall was not sufficiently severe during an hours-long delay in receiving an evaluation), *with Galvan v. Calhoun County*, 719 F. App'x 372, 375 (5th Cir. 2018) (per curiam) (holding that an inmate eventually diagnosed with calculus of gallbladder with acute cholecystitis showed substantial harm when he alleged that he made repeated requests over several days to be taken to the hospital for pain "so severe that he

23/31

thought he might die."); *Coleman v. Sweetin*, 745 F.3d 756, 765–66 (5th Cir. 2014) (per curiam) (finding substantial harm from a month-long delay in treatment for a broken hip during which the plaintiff "was in so much pain that he was unable to lie down in bed or use the toilet properly," pain overtook his entire body, he was "out of it" due to the pain, and doctors eventually inserted four pins and a plate during hip surgery); *and Harris v. Hegmann*, 198 F.3d 153, 159–60 (5th Cir. 1999) (per curiam) (finding substantial harm due to a week-long delay in treatment for a broken jaw).

Young does not satisfy this standard. While the Court does not question that he suffered pain, the question is whether the pain was sufficiently severe to constitute substantial harm. Young's medical records show that his sick-call requests after the incident were for mental health treatment, not pain from his eye. (Dkt. 75, pp. 39, 41). Further, his medical records from June 14—just three days after the incident with McDonald—reflect a referral to nursing staff based only on complaints of "orbital redness." (Dkt. 56-4, p. 21). A medical note from June 22 shows that Young reported orbital redness and eye pain to Nurse Ihaza, who referred him to nursing triage. (*Id.* at 9). A triage interview note with Mental Health Provider Greer from June 23 notes that Young's eye is red but does not document any complaints of pain. (*Id.* at 5). While the Court does not discount Young's pain, these records do not

24/31

document a level of pain sufficiently severe to constitute substantial harm under the standards set out above.

In sum, Young offers no evidence sufficient to raise a genuine issue of material fact as to whether the three-day delay in treatment occasioned by the actions of Lavan and Watson resulted in substantial harm. It did not. The undisputed evidence therefore shows that Lavan and Watson's conduct, while perhaps callous and in violation of TDCJ rules, did not rise to the level of a constitutional violation.

The motion for summary judgment by Lavan and Watson on the basis of deliberate indifference is granted. Young's claims against them for deliberate indifference will be dismissed with prejudice.

### C.    The Deliberate Indifference Claim Against Varughese

Finally, Young alleges that Nurse Varughese violated his constitutional rights by refusing to examine him or provide him with treatment for his eye injury. He also alleges that she destroyed the sick-call requests that he submitted to prevent him from obtaining care. Varughese responds that there is no evidence that she was deliberately indifferent to Young's injury and that his allegations otherwise are legally insufficient.

The Eighth Amendment protects prisoners from cruel and unusual punishment arising from a prison medical provider's deliberate indifference. *See Estelle v. Gamble*, 429 U.S. 97, 105 (1976). To prevail on such a claim, the prisoner must

25/31

prove that the prison medical provider acted with "deliberate indifference" to a "serious medical need" in a manner that "constitutes the unnecessary and wanton infliction of pain[.]" *Id.* at 104 (cleaned up). Deliberate indifference in this context "is more than mere negligence or even gross negligence." *Brown v. Callahan,* 623 F.3d 249, 255 (5th Cir. 2010). "Actions and decisions by officials that are merely inept, erroneous, ineffective or negligent" do not amount to deliberate indifference. *Doe v. Dallas Indep. Sch. Dist.,* 153 F.3d 211, 219 (5th Cir. 1998). Neither do "[u]nsuccessful medical treatment, acts of negligence, . . . medical malpractice" or "a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Gobert,* 463 F.3d at 346 (cleaned up). Instead, to obtain relief for a constitutional violation based on deliberate indifference, the prisoner must show that the prison medical provider "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* (cleaned up). And, in the context of a delay in medical care, the prisoner must also allege and prove that the denial of or delay in care resulted in substantial harm. *Petzold,* 946 F.3d at 249.

Young alleges that he saw Varughese on several occasions after the June 11 fight when she was distributing medications or performing other nursing tasks in the pod. (Dkts. 12, pp. 17–18; 67, p. 3). He alleges that he asked for treatment for his

26/31

eye at those times, but she ignored his requests. (*Id.*). Instead, she told him to submit a sick-call request. (Id.). He alleges that he complied and submitted sick-call requests, but Varughese "trashed" them. (Dkts. 12, pp. 17–19; 67, p. 4). He alleges that both actions establish deliberate indifference.

Varughese points to medical records from June 14 and 22 that she contends show that she provided Young with timely medical care for his eye. But the Court does not find that Varughese's electronic stamp on the medical records from June 14 and 22 establishes that she personally assessed his eye injury on those dates. (Dkt. 56-4, pp. 9, 22). The record from June 14 is psychiatric assessment performed due to Young's transfer to a new "chronic care tank." (*Id.* at 17). While the record notes "orbital redness" from the altercation with McDonald, there is no assessment of the eye injury in the nine-page document, no treatment notes, and no plan of care mentioned other than a referral to nursing triage. (*Id.*). Standing alone, this record does not show that Varughese provided care for Young's injury on that date. And the record from June 22 was electronically signed by Varughese on June 28, indicating a review of the record rather than her being present for his assessment and to provide treatment. (*Id.* at 9).

Despite rejecting these documents, however, the Court finds that Young has failed to carry his burden to show that genuine issues of fact exist concerning whether Varughese acted with deliberate indifference for three reasons. First,

Young's allegation that Varughese ignored his request for care made when she was in the pod does not establish deliberate indifference. Young alleges that on unspecified dates, he saw Varughese in the pod dispensing medications, he asked her directly for care for his eye, and she either ignored him or told him to submit a sick-call request. But he offers no support for the proposition that Varughese should have stopped the nursing task she was performing when she encountered him in the pod and examined his eye at that time. TDCJ policies provide that inmates may access medical services by submitting a sick-call request or making a direct request with a correctional officer or supervisor. *See* TDCJ Offender Handbook, www.tdcj.texas.gov/documents (visited June 29, 2026). They do not provide for access to medical services by approaching medical staff engaged in other duties in the pod and demanding care. Varughese's failure to respond to Young's improper request for care does not demonstrate that she "failed to act despite [her] knowledge of a *substantial* risk of *serious* harm." *Farmer*, 511 U.S. at 842 (emphasis added). Although these facts might support a claim of negligence or even gross negligence, they are insufficient to establish deliberate indifference.

Second, Young's allegation that Varughese "trashed" his sick-call requests is unsupported by any evidence. Specifically, Young alleges that he submitted multiple sick-call requests to obtain treatment for his eye but that Varughese "trashed" them rather than scheduling appointments. This contention is based on

28/31

nothing but speculation. Young offers nothing to support his claim that any sick-call requests he submitted were "trashed" or that, even if they were, it was Varughese who did so. Such unsubstantiated statements will not support a claim for deliberate indifference.

And third, the medical records belie Young's assertion that he was denied care from June 11 until October 22. "Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference." *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995). The records show that Young submitted sick-call requests for mental health treatment on June 14 and June 20. (Dkt. 75, pp. 39, 41). He received the mental health care he requested. (*Id.* at 29–37, 47–50). His first sick-call request for *medical* care, rather than mental health care, was submitted on July 1. (*Id.* at 52). And he was seen in the clinic by Varughese on July 3. (*Id.* at 54–56). While Young may not have received the care he wanted, he received the care he requested through the proper TDCJ channels.

Young has failed to carry his burden to show that genuine issues of material fact exist concerning whether Varughese was deliberately indifferent to his eye injury. The motion for summary judgment by Varughese will be granted and Young's claims against her will be dismissed with prejudice.

29/31

### D.    Qualified Immunity

In the alternative, the defendants move for summary judgment based on qualified immunity. "Qualified immunity protects officers from suit unless their conduct violates a clearly established right." *Austin v. City of Pasadena, Tex.*, 74 F.4th 312, 322 (5th Cir. 2023) (quoting *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003)); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). When the defendant raises the defense of qualified immunity, the burden shifts to the plaintiff to show that the defendants are not entitled to that immunity. *See Thompson v. Upshur County, Tex.*, 245 F.3d 447, 456 (5th Cir. 2001).

As explained above, Young does not point to evidence sufficient to show that any of the defendants violated his constitutional rights. Without a constitutional violation, analysis of the second element is unnecessary. The defendants are therefore entitled to qualified immunity, and Young's action against them is dismissed with prejudice.

## IV.    CONCLUSION

Based on the foregoing, the Court **ORDERS** as follows:

1. The Motion for Summary Judgment filed by defendants Lavan, Watson, and Varughese, (Dkt. 56), is **GRANTED.**

2. Young's civil-rights action is **DISMISSED with prejudice.**

3. Final judgment will be separately entered.

30/31

The Clerk will provide a copy of this Order to the parties.

SIGNED at Houston, Texas, on _____July 2_____, 2026.

DAVID HITTNER
UNITED STATES DISTRICT JUDGE